# 2000 DTA 173

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL DE PONCE Y AIBONITO**
**PANEL I**

PABLO APONTE DIAZ, MAXIMINA RODRIGUEZ SANTIAGO Y LA SOCIEDAD LEGAL DE
GANANCIALES COMPUESTA POR AMBOS; ROGELIO APONTE DIAZ; FERNANDO SANTIAGO
CARTAGENA; JESUS MARTINEZ RIVERA, EVAGELISTA MARRERO CARDENALES Y LA SOCIEDAD
LEGAL DE GANANCIALES COMPUESTA POR AMBOS
Demandantes-Apelados

v.

AUTORIDAD DE ENERGIA ELECTRICA, EASTER AMERICA INSURANCE CO.
Demandados-Apelantes

ESTADO LIBRE ASOCIADO DE P.R.
Demandado

Núm. KLAN-97-00144

San Juan, Puerto Rico, a 11 de agosto de 2000

Panel integrado por su Presidente, Juez Negrón Soto
y los Jueces Segarra Olivero y Aponte Jiménez

Segarra Olivero, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

La Autoridad de Energía Eléctrica y su aseguradora Eastern American Insurance Co., --en adelante nos referiremos a éstos en conjunto como los apelantes--, nos solicitan la revocación de una sentencia dictada por el Tribunal de Primera Instancia, Sala Superior de Ponce, mediante la cual se declaró con lugar la demanda sobre daños y perjuicios instada por los demandantes-apelados de epígrafe.

Por los fundamentos que más adelante exponemos, modificamos la sentencia apelada en lo concerniente a la valorización de los daños sufridos y las angustias mentales. Así modificada, se confirma.

### I

El 20 de julio de 1988, Pablo Aponte Díaz, Maximina Rodríguez Santiago y la sociedad legal de gananciales por ellos compuesta; Rogelio Aponte Díaz; Fernando Santiago Cartagena; Jesús Martínez Rivera, Evangelista Marrero Carreras, y la sociedad legal de gananciales por ellos compuesta, en lo sucesivo nos referiremos a estos demandantes en conjunto como los apelados, presentaron demanda en daños y perjuicios contra varios demandados entre los que figuraban la Autoridad de Energía Eléctrica, en adelante la A.E.E., su compañía aseguradora y el Estado Libre Asociado de Puerto Rico, en lo sucesivo el E.L.A. ■ En esta demanda alegaron que eran agricultores de unas fincas ubicadas en el Barrio Cintrona de Juana Díaz, las cuales poseían por virtud de contratos de arrendamiento con la Autoridad de Tierras, y que debido a unas inundaciones ocurridas el 27 de noviembre de 1987, sufrieron daños considerables. Sostuvieron, además, en lo pertinente, lo siguiente:

*"11. La causa próxima de las inundaciones descritas en los párrafos precedentes fue la negligencia combinada de las co-demandadas Autoridad de Energía Eléctrica y Autoridad de Acueductos y Alcantarillados en la operación y mantenimiento de los Lagos Guayabal y Toa Vaca, respectivamente, y del co-demandado, Departamento de Recursos Naturales, por la falta de limpieza y mantenimiento al cauce del Río Jacaguas de Juana Díaz.*

*12. La negligencia de la co-demandada, Autoridad de Energía Eléctrica, consistió en permitir y realizar grandes descargas de agua de la represa del Lago Guayabal al Río Jacaguas, lo cual aumentó el nivel de las aguas en el cauce de dicho río provocando su desbordamiento."*

Los apelados reclamaron daños por las averías sufridas al sistema de riego, daños a las siembras y cosechas, ganancias dejadas de percibir y sufrimientos y angustias mentales.

Los apelantes contestaron la demanda y negaron esencialmente todas las alegaciones. Levantaron como defensas afirmativas, en lo pertinente, que los hechos contenidos en la demanda fueron producto de un caso fortuito o acto de Dios, por lo que no podía adjudicársele responsabilidad alguna a la A.E.E. y que los daños alegados eran excesivos, especulativos y remotos.

Las partes presentaron su informe sobre conferencia preliminar. Debemos mencionar que en dicho informe, las partes estipularon que la A.E.E. es la responsable de la operación y el mantenimiento de la represa del Lago Guayabal. En el juicio en su fondo, declararon los apelados Pablo Aponte, Rogelio Aponte, Fernando Santiago Cartagena, y Jesús Martínez Rivera. Declaró, además, el Dr. Rafael Segarra García como perito en hidrología. Por la A.E.E., testificaron el Sr. Edgardo Torres Rivera como testigo y perito en el área de hidrología y operación de represas, quien para la fecha de las inundaciones se desempeñaba como Ingeniero Supervisor de Regadío para la A.E.E. en el área de Juana Díaz y tenía a su cargo la supervisión de la operación y el mantenimiento de la Represa Guayabal, y el Sr. Luis Rodríguez Hernández, quien para el mismo tiempo se desempeñaba como Supervisor de Riego de la A.E.E. para el área de Juana Díaz. Las partes sometieron abundante prueba documental demostrativa.

Luego de analizada toda la prueba, el Tribunal *a quo* dictó sentencia mediante la cual declaró con lugar la demanda incoada contra la A.E.E. y el E.L.A. Concluyó que la A.E.E. fue negligente en la operación de la represa del Lago Guayabal al no tomar acciones preventivas para evitar las inundaciones río abajo del embalse y al no diseñar algún tipo de medida de control de inundaciones en el sistema de la represa, y que la inundación de los terrenos se debió, en mayor parte, a la operación deficiente de la represa del Lago Guayabal, por lo que le atribuyó una responsabilidad de 75% de los daños causados. El Tribunal *a quo* sostuvo, además, que el E.L.A. es responsable del restante 25% de los daños causados por la falta de mantenimiento del Río Jacaguas.

El Foro apelado estimó los daños sufridos por los apelados por concepto de las inversiones realizadas, pérdidas de siembra, ingresos dejados de percibir y sufrimientos y angustias mentales. Concedió las siguientes partidas: a Pablo Aponte Díaz, $110,350; a Rogelio Aponte Díaz, $164,750; a Fernando Santiago Cartagena, $104,550 y a Jesús Martínez Rivera, $74,600. El Tribunal desestimó las reclamaciones instadas por las cónyuges de Pablo Aponte Díaz y de Jesús Martínez Rivera porque no se presentó prueba en cuanto a los daños sufridos por éstas.

Inconforme con tal dictamen, la A.E.E. apela ante nos mediante el presente recurso en el que sostiene que erró el Tribunal apelado al:

"A... determinar que la A.E.E. fue negligente en el caso de epígrafe, cuando se demostró: (1) que la causa próxima de las inundaciones fueron causas no relacionadas con la represa; (2) las inundaciones se debieron a otras causas; (3) se demostró cuantitativa y cualitativamente que la represa en nada contribuyó a las inundaciones y en todo caso tuvo un efecto de evitar que las mismas fueran peores; (4) no se demostró que la A. E.E. hubiera sido negligente.

B ... imponer responsabilidad a la A.E.E. cuando la represa del Lago Guayabal no le pertenece, sino al Estado Libre Asociado; también al determinar que la A.E.E. la administra por contrato cuando es por disposición de ley; también al imponerle responsabilidad civil en exceso de los límites provistos por la Ley de Pleitos contra el Estado.

C... al conceder los daños a los demandantes; al conceder daños no demostrados, ni que se sustentan con la prueba."

Luego de varios esfuerzos para presentar una exposición estipulada de la prueba testifical presentada en el juicio, la A.E.E. nos solicitó que ordenáramos la transcripción de la prueba oral, a lo cual accedimos. Posteriormente, ordenamos la elevación de los autos originales ante nos. Los apelados presentaron el alegato correspondiente. Examinados los autos originales, la transcripción de la prueba oral, los alegatos de las partes, la ley y la jurisprudencia aplicable, nos encontramos en posición de resolver.

## II

La responsabilidad civil derivada de actos u omisiones culposas o negligentes se rige por lo dispuesto en el Artículo 1802 de nuestro Código Civil, 31 L.P.R.A. sec. 5141. *Montalvo Feliciano v. Cruz Concepción,* ___ D.P.R. ___ (1998), **98 J.T.S 6**, a las págs. 498-499; *Toro Aponte v. E.L.A.,* ___ D.P.R. ___ (1997), **97 J.T.S. 18**, a la pág. 627; *Elba A.B.M. v. U.P.R.,* 125 D.P.R. 294 (1990). Dicho artículo impone responsabilidad al que causa daño a otro, ya sea mediante acción u omisión en la que intervenga culpa o negligencia. *Laureano Pérez v. Soto,* ___ D.P.R. ___ (1996), **96 J.T.S. 88**. Para imponer responsabilidad civil bajo el Artículo 1802, *supra,* es necesario que concurran tres (3) requisitos o elementos, a saber: (1) daño sufrido; (2) acto u omisión culposo o negligente; (3) que exista la correspondiente relación causal entre el daño y la acción u omisión culposa o negligente de la otra parte. *Montalvo Feliciano v. Cruz Concepción, supra,* a la pág. 499; *Toro Aponte v. E.L.A., supra; Ramírez Salcedo v. E.L.A.,* ___ D.P.R. ___ (1996), **96 J.T.S. 41;** *Tormos Arroyo v. Departamento de Instrucción Pública,* ___ D.P.R. ___ (1996), **96 J.T.S. 34.**

La culpa o negligencia es la falta del debido cuidado, que a la vez consiste esencialmente en no anticipar y

prever las consecuencias racionales de un acto, o de la omisión de un acto, que una persona prudente habría de prever en las mismas circunstancias. *Ramos v. Carlo,* 85 D.P.R. 353, 358 (1962). Para determinar si una omisión genera responsabilidad, se considerarán los siguientes elementos: (1) la existencia o inexistencia de un deber jurídico de actuar por parte del alegado causante del daño, el incumplimiento del cual constituye la antijuridicidad, y (2) si de haberse realizado el acto admitido, se hubiera evitado el daño. *Toro Aponte v. E.L.A, supra.*

Sabido es que en nuestro ordenamiento rige la teoría de la causalidad adecuada, conforme la cual *"No es causa toda condición sin la cual no se hubiera producido el daño, sino la que ordinariamente lo produce según la experiencia general".* J. Santos Briz, *Derecho de Daños,* Ed. Rev. Der. Pvdo., 1963, págs. 215 y ss.; *Soc. de Gananciales v. Jerónimo Corp.,* 103 D.P.R. 127, 134 (1976). Así, pues, *"[u]n daño parece ser el resultado natural y probable de un acto negligente, si después del suceso y mirando retroactivamente el acto que se alega ser negligente, tal daño aparece como la consecuencia razonable y ordinaria del acto".* *Torres-Trumbull v. Pesquera,* 97 D.P.R. 338, 343 (1969).

## III

El primer error señalado por los apelantes está dirigido a cuestionar la conclusión del Tribunal *a quo* a los efectos de que la A.E.E. fue negligente en la operación de la represa del Lago Guayabal y que tal actuación fue la causa de los daños sufridos por los apelados. En lo que atañe a este aspecto, el Tribunal apelado dispuso, en la página 22 de su sentencia, que:

*"Este Tribunal, con el beneficio de la prueba desfilada y admitida, concluye que las inundaciones de los predios de terreno de los demandados fueron consecuencia directa del gran caudal de agua descargada a través de las compuertas de la represa del Lago Guayabal al momento en que el lago alcanzó su máxima capacidad y el sistema operacional activó su apertura, liberando 23,156 pies cúbicos por segundo el día 27 de noviembre de 1987, cuya recurrencia es de 30 años y que excede por mucho la precipitación observada en el mismo día sobre el área de captación del lago. Concluimos, además, que la omisión de la Autoridad de Energía Eléctrica de tomar medidas para cambiar o alterar la política operacional de la represa, fue la condición sin la cual no se hubiesen producido las descargas de agua en la magnitud observada, que, a su vez, produjeron el desbordamiento de las aguas del Río Jacaguas en todo el valle donde se encontraban las fincas de los demandantes, produciendo así los daños señalados."*

No erró el Foro *a quo* al así resolver, toda vez que las conclusiones a las que arribó están avaladas por la prueba pericial presentada por los apelados.

El Dr. Rafael Segarra García, perito presentado por los apelados, declaró que se desempeña como profesor de Hidrología en el Recinto Universitario de Mayagüez, que posee un bachillerato en ingeniería civil, una maestría en ingeniería sanitaria, una maestría y doctorado en recursos de agua. El Dr. Segarra indicó que había realizado un estudio en febrero de 1994 titulado *"Estudio hidrológico e hidráulico relacionado al problema de inundaciones del Río Jacaguas"* con el propósito de establecer el potencial de inundaciones en el sector como consecuencia de la operación de los embalses de Guayabal y Toa Vaca y hacer una evaluación hidrológica del sector para establecer la posible recurrencia de inundaciones como efecto de las actividades que se llevan a cabo en la cuenca, en términos de represar el agua.

El testimonio del Dr. Segarra estuvo dirigido a establecer que la política de operación de la represa del Lago Guayabal, de mantenerla llena de agua a su capacidad máxima para poder suplir las necesidades de riego, no es la más adecuada y constituye un peligro para las personas y los terrenos que se encuentran río abajo del embalse. Aunque el perito manifestó que las compuertas de la represa abren mecánicamente cuando el agua almacenada en la represa alcanza el nivel de 341 pies, descargándose el agua hacia el Río Jacaguas, y que la represa y el Lago Guayabal no fueron diseñados para controlar inundaciones, también destacó la necesidad de que se establezcan ciertos controles para prevenir inundaciones que sí pueden ser implementados por el hombre, como mantener cierto espacio libre en el embalse para captar las aguas cuando hay mucha precipitación.

El Dr. Segarra indicó que el 27 de noviembre de 1987 cayeron unas lluvias torrenciales en el área de Juana Díaz, y específicamente en el área de la represa y el Lago Guayabal se registraron alrededor de seis (6) pulgadas de lluvia; que el lago, antes de esta fecha, se encontraba lleno a capacidad; y que esta precipitación ocasionó la apertura de las compuertas para descargar gran cantidad de agua al cauce del Río Jacaguas en dirección hacia Juana Díaz, lo que provocó las inundaciones. Una precipitación de seis (6) pulgadas sobre el Lago Guayabal tiene una recurrencia [2] de tres (3) años, es decir, que una precipitación de esa magnitud es probable que ocurra cada tres años, lo que se considera un evento bastante frecuente. El Dr. Segarra manifestó que la descarga [3] de agua observada el 27 de noviembre de 1987 del Río Jacaguas, medida que fue obtenida de las estaciones de medición del caudal del Río Jacaguas, fue una de tal magnitud que su recurrencia es de veinticinco (25) años o más, que es mucho mayor a la correspondiente a la precipitación que se produjo ese día. El Dr. Segarra señaló que el comportamiento en la descarga de la represa es consecuencia directa de la forma en que se opera el sistema, pues al mantener el lago lleno a capacidad y sin tomar las medidas prudentes y razonables para eventos de lluvia, se reducen al mínimo las posibilidades de atenuar las ondas de descarga de entrada al embalse y de controlar las inundaciones.

El Dr. Rafael Segarra sostuvo, además, que el efecto de mantener el embalse lleno a capacidad en los períodos de lluvia intensa en Puerto Rico, regularmente durante los meses de septiembre a noviembre, es que cualquier precipitación que ocurra va a provocar una descarga, al abrirse las compuertas. Concluyó el perito que la política de operación del embalse contribuyó directamente al desbordamiento del Río Jacaguas, pues la misma no da margen a prever un evento de precipitación persistente y a tomar acciones preventivas para evitar inundaciones río abajo del embalse.

Además del testimonio del perito Dr. Rafael Segarra, el Tribunal *a quo* consideró el *"Informe sobre la Evaluación del Problema de Inundaciones del Río Jacaguas"* preparado por el Departamento de Recursos Naturales en agosto de 1985, en el que se hicieron varias recomendaciones para el control de inundaciones. Entre éstas, se incluyó hacer una evaluación de la Represa Guayabal para reducir las descargas máximas para diferentes eventos de lluvia y proveer capacidad para control de inundaciones, ya sea mediante una reprogramación de su uso o modificación de la estructura. El Tribunal consideró el hecho de que la A.E.E., a pesar de tener bajo su control la represa y el Lago Guayabal por más de cincuenta (50) años, no atendió las recomendaciones antes indicadas ni ha iniciado gestión alguna para establecer algún tipo de mecanismo de control de inundaciones.

El Tribunal *a quo* rechazó los fundamentos utilizados por la A.P.E. para sostener su posición de que la operación de la represa no fue lo que ocasionó las inundaciones, los cuales se resumen a continuación: (a) que la operación de la represa es una automática, en la que no interviene la mano del hombre, cuyo sistema fue establecido luego de rigurosos cálculos y estudios para garantizar la seguridad de la represa; y (b) que en el caso de autos, la represa tuvo un efecto dilatador de las escorrentías pico; por lo tanto, su existencia provocó menos descarga de aguas de lo que se hubiera provocado por el fenómeno atmosférico.

En cuanto al efecto dilatador de la represa, el Tribunal descartó el análisis matemático presentado por la A. E.E. (el cual estuvo fundado en las escorrentías medidas en varias estaciones del área y la distancia en millas cuadradas entre las estaciones) para tratar de establecer y distinguir las escorrentías que fueron aportadas por la represa y las que fueron aportadas por las áreas bajo la represa. Así, en lo pertinente, concluyó que:

*"...En primer lugar, no hay duda alguna de que el día 27 de noviembre se abrieron las compuertas de la represa y hubo una gran descarga de agua hacia el Río Jacaguas (23,156 p/c/s). Este es un dato objetivo en el cual coincidieron los peritos de ambas partes. Esa agua no fue sólo producto de la precipitación de ese día y tampoco el agua sale desbordándose del embalse, es decir, no es el sobrante lo que va saliendo del río.*

*Las compuertas se encuentran a su altura máxima, lo que maximiza la capacicidad de almacenaje del embalse, proveyendo una altura de diez (10) pies sobre la cresta del vertedor. Al abrirse las compuertas, sale*

*esa agua almacenada. Es obvio que eso produce una mayor concentración de agua en la escorrentía del río. No es lógico decir que la descarga de la represa no causó o contribuyó a causar la inundación porque la escorrentía que produjo fue menor a la producida en las restantes áreas de captación hasta la finca de los demandantes. Lo cierto, repetimos, es que sí se produjo una gran descarga de la represa que llegó al Río Jacaguas. Naturalmente, el río iba recibiendo más escorrentía de las áreas de captación que le nutrían hasta la vía del ferrocarril."*

*"En segundo lugar, los datos usados por los peritos para calcular la escorrentía por áreas de captación no representan la escorrentía pico. Como sostiene el perito de la parte demandante, no es cierto que la diferencia entre la escorrentía medida en el área de la represa (23,156) y la estimada en la vía del ferrocarril (48,736), que asciende a 25,580, represente el aumento en escorrentía pico, sino de escorrentía promedio, y con algunos datos estimados, como la escorrentía de la vía del ferrocarril."*

En cuanto al argumento de la A.E.E. de que la operación mecánica de la represa es automática, por lo que no interviene la mano del hombre y no puede ser cambiada, el Tribunal apelado adoptó nuevamente la teoría esbozada por el perito de los apelados al disponer, en la página 10 de su sentencia, que:

*"El perito de la parte demandante sostiene que hay solución para ese problema; esto es, cambiar la política de operación para que se deje con capacidad de almacenaje; que no se mantenga llena. Por otro lado, el perito de la A.E.E. aceptó que la mano del hombre interviene en cierta forma en la operación de la represa, porque para la entrega de agua para riego se operan unas compuertas manualmente, las cuales son independientes de la represa, mediante una tubería de 36 pulgadas que sale del lago. Es obvio, pues, que según se puede sacar agua del lago para distribuir a los agricultores, se puede, así mismo, sacar agua para bajar el nivel del embalse y evitar inundaciones, especialmente en épocas de gran intensidad de lluvias."*

De lo anterior se colige que el Tribunal sentenciador avaló la opinión emitida por el perito de los apelados en lo que respecta a la determinación de que la A.E.E. fue negligente en la operación de la represa y que fue dicha operación deficiente lo que provocó los daños sufridos por los apelados. Dicho Foro estimó que estaban presentes los requisitos necesarios para la imposición de responsabilidad civil bajo el Art. 1802 del Código Civil, *supra*, al disponer que *"[l]os demandantes sufrieron daños como consecuencia de la acción negligente de la Autoridad de Energía Eléctrica de mantener la represa sin medidas de control de inundaciones o de la omisión de tomar tales medidas en previsión de los daños que se podían ocasionar"*. Tal conclusión está sostenida por la prueba presentada. Nosotros no intervendremos con la misma.

En el caso de autos, el Foro apelado, luego de evaluar toda la evidencia pericial que tuvo ante su consideración, le otorga mayor valor probatorio al perito de los apelados, Dr. Rafael Segarra García, quien, además, posee unas excelentes cualificaciones y experiencia profesional en el área de hidrología y realizó diversos estudios relacionados con la controversia de autos. Las apreciaciones del Tribunal sentenciador tienen apoyo en la prueba presentada, por lo que deben ser objeto de gran deferencia en ausencia de circunstancias extraordinarias o indicios de pasión, prejuicio, parcialidad o error manifiesto. *Riley v. Rodríguez de Pacheco*, 119 D.P.R. 762, 797 (1987).

Luego de examinar cuidadosamente el expediente ante nuestra consideración, entendemos que el Tribunal *a quo* actuó correctamente al declarar con lugar la demanda en daños y perjuicios instada por los apelantes. El Tribunal le otorgó mayor valor probatorio y credibilidad al testimonio y la opinión emitida por el perito de los apelados que al testimonio del perito de los apelantes. El primer error señalado por los apelantes no fue cometido.

## IV

El segundo señalamiento de error de los apelantes carece de méritos. La prueba aportada por las partes demostró que es la A.E.E. quien ha mantenido el control de la represa del Lago Guayabal por un período de tiempo considerable de más de cincuenta (50) años. La cuestión de si la A.E.E. opera la represa por virtud de un

contrato o de una ley, no tiene ningún efecto sobre la disposición del caso de autos. De todas maneras, las partes estipularon el hecho de que la A.E.E. es la responsable de la operación y el mantenimiento de la referida represa. Por último, la A.E.E. no puede invocar que se le aplique el límite de responsabilidad que impone la Ley de Pleitos contra el Estado, Ley Núm. 104 de 29 de junio de 1955, 32 L.P.R.A. secs. 3077 *et seq.*, pues es un ente jurídico con personalidad jurídica propia, con capacidad para demandar y ser demandado. Véase, Art. 1 de la Ley Núm. 83 de 2 de mayo de 1941, según enmendada, 22 L.P.R.A. sec. 193.

## V

El tercer señalamiento de error cuestiona la estimación y valorización de los daños concedidos a los apelados. Los apelantes sostienen que los daños resultan excesivos e inconsistentes con la prueba presentada.

Examinemos el derecho aplicable.

El Tribunal Supremo ha expresado que aunque en nuestra jurisdicción no se ha formulado una definición integral de *"daño"*, capaz de abarcar la diversidad de matices que dicho concepto tiene, es claro que para que ocurra un daño real indemnizable bajo el Artículo 1802, *supra*, tienen que concurrir tres elementos esenciales. Dos de ellos están relacionados propiamente con el daño en sí; estos son: (1) que el daño ha de causar una lesión, pérdida o menoscabo, y (2) que éste ha de recaer sobre bienes o intereses jurídicos de una persona. El tercero, es que el daño ha de ser resarcible de alguna forma. *Soto Cabral v. E.L.A.*, 138 D.P.R. 298, 312 (1995).

Los daños intangibles se consideran daños no patrimoniales porque su valoración pecuniaria no se funda en una equivalencia matemática. Sin embargo, no por eso dejan de ser compensables en dinero. Entre estos, se encuentran el sufrimiento, las angustias mentales y los daños emocionales. *Santini Rivera v. Serv. Air, Inc.*, *supra*, a la pág. 183.

Nuestro Tribunal Supremo ha expresado que:

*"... la necesidad de indemnizar por daños en nuestro ordenamiento no es ad finitum; hemos de recordar que nuestra sociedad refleja un apetito voraz hacia lo material, y no podemos convertir el dolor, el sufrimiento, la tristeza, el desamparo y la frustración, en simplemente otro bien de consumo y tráfico comercial. La indemnización por daños tiene que corresponder a la prueba, no es una industria forense. (Citas omitidas.) Para indemnizar un daño, hay que realmente sufrirlo y probarlo."* Cintrón Adorno v. Gómez, ___ D.P.R. ___ (1999), **99 J.T.S. 20**, a la pág. 615.

La gestión judicial de estimación y valoración de daños es una difícil y angustiosa, ya que no existe un sistema mecánico que nos permita llegar a un resultado exacto en relación con el cual todas las partes estén satisfechas. *García Pagán v. Shiley Caribbean*, 122 D.P.R. 193, 212 (1988); *Rodríguez v. A.E.E.*, 116 D.P.R. 443, 451 (1985); *Urrutia v. A.A.A.*, 103 D.P.R. 643 (1975).

La existencia de un cierto grado de especulación no impide que el tribunal, a base de los hechos particulares del caso y la prueba presentada, pueda determinar una cuantía adecuada y razonable para compensarle al reclamante los daños sufridos. *García Pagán v. Shiley Caribbean, supra*, págs. 212-213.

## VI

Con este trasfondo doctrinal, examinemos si procede que modifiquemos las cuantías de daños concedidas por el foro sentenciador, tomando en cuenta que tenemos ante nuestra consideración la transcripción de la prueba oral vertida en el juicio en su fondo del caso. Debemos también aclarar que los apelados no presentaron prueba documental alguna para sustentar el valor de los daños sufridos, toda vez que sólo se valieron de sus testimonios para probar los mismos.

Sin embargo, no debemos olvidar que es norma firmemente establecida que la declaración de un testigo que

le merezca entero crédito al juzgador, es suficiente para establecer cualquier hecho. Regla 10 (d) de las Reglas de Evidencia, 32 L.P.R.A. Ap. IV, R. 10 (d).

En lo que respecta a la valorización de los daños sufridos, el Tribunal *a quo* detalló las pérdidas sufridas por cada uno de los apelados de la siguiente forma:

1. PABLO APONTE DIAZ

A- Pérdidas sufridas en la cosecha y preparación del terreno:
(1) Inversión en siembras:
Pimiento - 7 cdas. x $3,000 c/u = $21,000
Berenjena - 7 cdas. x $2,800 c/u = 19,600
Repollo - 10 cdas. x $2,300 c/u = 23,000
Total siembras = $63,600
(2) Terrenos preparados para siembra
63 cdas. x $200 = $12,600
(3) Sistema de riego (inversión mano de obra)
63 cdas. x $50 = $3,150
Total pérdida de la inversión = $79,350

B- Ingresos dejados de percibir
$2,000 mensuales por seis meses = $12,000

C- Angustias mentales = $10,000

Total daños = $101,350

2. ROGELIO APONTE DIAZ

A- Pérdidas sufridas en la cosecha y preparación de terreno:
(1) Inversión en siembras:
Cebolla - 35 cdas. x $2,500 c/u = $87,500
Habichuelas - 2 cdas. x $5,000 c/u = 10,000
Repollo - 8 cdas. x $2,300 c/u = 18,400
Total siembras: $115,900
(2) Terrenos preparados para la siembra
100 cdas. x $250 = $25,000
(3) Daños sistema de riego = $1,850 ·
Total pérdida en inversión = $142,750

B- Ingresos dejados de recibir
$2,000 mensuales por seis meses = $12,000

C. Angustias mentales = $10,000

Total daños = $164,750

3. FERNANDO SANTIAGO CARTAGENA

A- Pérdidas en la cosecha y preparación de terreno:
(1) Inversión en siembras:

Cebolla - 7 cdas. x $2,300 = $16,100
Repollo - 7 cdas. x $3,000 = $21,000
Berenjena - 4.5 cdas. x $400 = $1,800
Gandules - 16.5 cdas. x $300 = $4,950
Maíz - 34.5 cdas. x $600 = $20,700
Total siembras = $64,550
(2) Terrenos preparados para siembra
60 cdas. x $300 = $18,000
Total pérdida en inversión = $82,550

B. Ingresos mensuales dejados de percibir
$2,000 mensuales por seis (6) meses = $12,000

C. Angustias mentales = $10,000

Total daños = $104,550

4. JESUS MARTINEZ RIVERA

A. Pérdidas sufridas en la cosecha y preparación de terrenos:
(1) Inversión en siembras:
Gandules - 36 cdas. x $400 = $14,400
Calabaza - 8 cdas. x $400 = $3,200
Pimientos - 4 cdas. x $2,700 = $10,800
Cebolla - 4 cdas. x 2,300 = $9,200
Total siembras = $37,600
(2) Terrenos preparados para siembra
50 cdas. x $300 = $15,000
Total pérdida en inversión = $52,600

B. Ingresos dejados de percibir
$2,000 mensuales por seis meses = $12,000

C. Angustias mentales = $10,000

Total daños = $74,600

No existe duda en cuanto al hecho de que los apelados sufrieron daños como consecuencia de las inundaciones ocurridas el 27 de noviembre de 1987. Examinemos la adecuacidad de las cuantías concedidas por el Tribunal *a quo*.

Los daños sufridos por los apelados relativos a la inversión por cuerda de las diferentes siembras están apoyados en la prueba testifical presentada por cada uno de éstos. El Tribunal sentenciador le otorgó credibilidad a los mismos. ■ No obstante lo anterior, un examen detallado de la transcripción oral nos permite concluir que erró el referido Foro al estimar ciertas partidas relacionadas con la inversión en las siembras y al conceder daños que no estuvieron avalados por la prueba testifical presentada. Veamos.

En lo que respecta a la inversión para siembra de repollo en la finca arrendada a Rogelio Aponte Díaz, éste declaró que el costo era de $2,500 por cuerda y no de $2,300 como dispuso el Tribunal en su sentencia. Tal cifra se modifica para conformarla al testimonio de éste. En cuanto a la inversión por siembra de berenjena y de gandules en la finca de Fernando Santiago Cartagena, el Tribunal dispuso en la sentencia apelada que el costo

por cuerda era de $400 y $300 dólares, respectivamente. Sin embargo, de la transcripción oral se desprende que éste testificó que el costo era, aproximadamente, de $3,000 por cuerda por la siembra de berenjena y de $400 por cuerda por la siembra de gandules. Entendemos que estas cifras deben ajustarse para que reflejen lo declarado por Fernando Santiago Cartagena.

Por otro lado, los apelados Pablo y Rogelio Aponte Díaz declararon que tenían un sistema de riego por goteo. Pablo Aponte Díaz testificó que el costo de la mano de obra de la instalación de dicho sistema ascendía a $50 la cuerda, y Rogelio Aponte Díaz sostuvo que el costo era de $250 por cuerda. Este sistema de riego es provisto por la Autoridad de Tierras y lo que el agricultor aporta es la mano de obra para su instalación.

En lo atinente a los daños alegadamente sufridos en el sistema de riego como consecuencia de las inundaciones, Pablo Aponte Díaz señaló que *"hubieron [sic] diferentes áreas que sufrieron daño físico"*, (pág. 75 de la carpeta 5 de la transcripción oral), mas no especifica cuáles fueron éstos. También, sostuvo que la inundación del 27 de noviembre de 1987 *"causó en parte daños al sistema"* (pág. 105, carpeta 5). Su descripción de los daños se refirió a un equipo que se dañó cuyo valor estimó en $800 dólares (pág. 106, carpeta 5). De la transcripción oral que obra ante nos, no se desprende que el Sr. Pablo Aponte Díaz haya declarado que sufrió daños en lo que respecta al sistema de riego que estaba instalado ni en cuanto a la cantidad de cuerdas en las que el referido sistema se vio afectado como consecuencia de las lluvias. Por tanto, la partida de daños al sistema de riego otorgada a Pablo Aponte Díaz no puede sostenerse y se elimina. Sí debe concederse una partida por $800 por el equipo del sistema de riego que se dañó. De la transcripción oral se desprende que el Sr. Rogelio Aponte Díaz testificó que como consecuencia de las inundaciones al sistema de riego, sufrió averías ascendentes a $1,890. Entendemos que dicha suma es la que debe prevalecer, no la de $1,850 plasmada en la sentencia apelada. (Pág. 16, carpeta 8 de la transcripción oral).

Por otro lado y en relación con la estimación de las ganancias dejadas de percibir, el propio Tribunal apelado señaló que dicha partida resultaba muy incierta, toda vez que la prueba que surge de las planillas de contribución sobre ingresos de los apelados de los años anteriores y posteriores a la inundación, refleja que éstos tuvieron pérdidas o escasas ganancias. A pesar de lo anterior, el Tribunal optó por tomar como medida *"el ingreso que recibía cada uno de ellos para cubrir sus gastos personales y familiares, estimados en una suma razonable de $2,000 mensuales"*.

Entendemos que tal determinación no tiene base alguna en la prueba presentada y no puede sostenerse. Los testimonios de los apelados, relacionados con los supuestos ingresos mensuales que recibían, fueron poco convincentes y especulativos. Si bien la lógica nos indica que de algo vivían los apelados y sus familias, éstos no pudieron explicar la procedencia ni el monto de sus ingresos. Añádase a lo anterior, que las planillas de contribución sobre ingresos para 1987 y 1988 de los apelados no reflejan ingreso alguno o reflejan muy poco ingreso. Tal partida debe eliminarse. ■

Por último, el Tribunal *a quo* le concedió a cada uno de los demandantes-apelados la suma de $10,000 por concepto de las angustias mentales sufridas como consecuencia de las inundaciones. Concluimos que la prueba presentada no apoya tal conclusión en cuanto a todos los apelados. El testimonio de Pablo Aponte Díaz fue uno muy detallado en cuanto a los sufrimientos y angustias mentales que padeció como consecuencia de las inundaciones, mas no así el de los restantes apelados. Por ello, la cantidad de $10,000 otorgada a éste se mantiene igual. El Tribunal *a quo* no podía otorgarle la misma cantidad por sufrimientos y angustias mentales a todos los apelados, pues la prueba de cada uno de éstos fue diferente en lo que concierne a ese aspecto.

Las cuantías concedidas por los sufrimientos y angustias mentales concedidas a Rogelio Aponte Díaz, ■ Fernando Santiago Cartagena, ■ y Jesús Martínez Rivera ■ resultan excesivas. Los testimonios de éstos en lo que se refiere a este aspecto fueron muy breves y poco explícitos, por lo que modificamos la cuantía concedida a $5,000.

Nuestro más Alto Foro ha expresado que:

*"Empero, como el dolor y sufrimiento no pueden ser objeto de cotización, para determinar el valor razonable de tales daños morales, es preciso que el reclamante, en cada caso, aporte los factores de evidencia necesarios para evaluarlos justa y adecuadamente, probando que no se trata de una simple pena pasajera, sino que, en alguna medida apreciable, el reclamante quedó afectado en su salud, bienestar, y felicidad. Moa v. E.L. A., 100 D.P.R. 573 (1972); Ramos Rivera v. E.L.A., 90 D.P.R. 828 (1964)."*

Consideramos que la parte apelante ha demostrado la existencia de las circunstancias que hacen meritorio el que modifiquemos las sumas concedidas por el Tribunal de Primera Instancia por concepto de los daños económicos y por los sufrimientos y angustias mentales.

Recapitulando, se modifican las cuantías concedidas respecto a las pérdidas sufridas en la siembra de repollo en la finca de Rogelio Aponte Díaz para aumentarla de $2,300 a $2,500 por cuerda y se aumenta la partida correspondiente a la inversión incurrida en la siembra de berenjena y gandules en la finca de Fernando Santiago Cartagena de $400 a $3,000 la primera y de $300 a $400 por cuerda la segunda.

Se elimina la partida de daños al sistema de riego concedida a Pablo Aponte Díaz de $3,150 y se le concede una por $800 por los daños que sufrió el equipo de riego. Se modifica, además, la cuantía concedida a Rogelio Aponte Díaz por daños al sistema de riego para que en lugar de $1,850 sea de $1,890. Se elimina la partida relativa a los ingresos dejados de percibir de todos los apelados.

Se mantiene vigente la partida de sufrimientos y angustias mentales ascendente a $10,000 concedida a Pablo Aponte Díaz. La de los restantes apelados se reduce a $5,000 para cada uno.

## VII

Por los fundamentos antes expuestos, modificamos la sentencia apelada en lo concerniente a la valorización de los daños sufridos y las angustias mentales. Así modificada, se confirma.

Así lo pronunció y manda el Tribunal y lo certificada la Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General